May it please the Court, my name is Christopher Winter, Counselor for Plaintiffs Appellants of the Cascadia Wildlands Project. In this case... Your Honors, this case involves the Forest Service's decision to log... I'm sorry, could you speak up? I'm sure. Sorry about that. Is this better? I'm afraid the sound system has departed us. It worked very well for the first half hour or so, I'll try to speak loudly. Maybe I don't even need to think about the microphone, but I'll just try to project my voice. We're back to 1875 standards now. We're going to have to speak up as they did in the original use of this courtroom. This case, Your Honors, involves the Forest Service's decision to log thousands of acres of wildlife habitat in the Metolius Late Successional Reserve in Central Oregon following a fire. The post-fire logging plans in this case fundamentally violate the balance created by the Northwest Forest Plan by aggressively targeting the largest trees that are most valuable to wildlife, while leaving heavy fuel loading in the form of small diameter material across the landscape. The specific and enforceable standards of the Northwest Forest Plan were specifically designed and implemented to prevent this exact type of project. This project will have a dramatic impact on wildlife habitat by targeting the largest trees and will leave heavy fuel loading in small diameter materials across the landscape. This is a case of first impression, and the interpretation of the Northwest Forest Plan set forth by the Forest Service in this case threatens to undermine the critical protections of the plan for late successional reserves across the Pacific Northwest. What degree of deference is owed to the agency's determination of what is appropriate? Your Honor, we do not believe the agency is entitled to any deference in its interpretation of the standards and guidelines of the Northwest Forest Plan. That's rather a remarkable statement. Why do you take such an extreme position? The agency has argued that the standards and guidelines that we rely on are general and not enforceable in the strict sense. The Northwest Forest Plan, however, directly contradicts that language. The Northwest Forest Plan states that the standards and guidelines are intended to provide specific management direction, including actions which are prohibited. I see a lot of language in the Northwest Forest Plan which talks about should, but I don't see very much that talks about must. Your Honor, in the excerpt of record at page 22, the Northwest Forest Plan includes a discussion of the standards and guidelines generally, and it states that those standards and guidelines are specifically intended to delineate prohibited actions and a description of the conditions that should occur there. So under the Forest Service's interpretation, if we read the language should in the absence of that language which prefaces the discussion of the standards and guidelines, those standards and guidelines become meaningless simply because they use the word should and not shall. Those guidelines are optional for the Forest Service to apply. The Northwest Forest Plan, however, specifically states that they are intended to prohibit certain actions and require other actions to be taken. And specific reference is made to habitat as I understand it. So if I understand you correctly, the Forest Service has failed to consider the overall forest plan in its specific actions in this particular case. That's correct. The Forest Service has failed to comply with the standards and guidelines of the Northwest Forest Plan which applies to all of the forests in the Pacific Northwest. The whole area. Right. And the Northwest Forest Plan has been incorporated into each individual forest plan. Your Honor, I would also say on the deference point, we would ask the Court to look at U.S. if you tried in Seafood Corporation, which is at 60 F. 3rd, 556. The agency is not entitled to deference. Excuse me. Have you cited that in your brief? We have, Your Honor. All right. The agency is not entitled to deference if it is simply advancing a litigation position to defend a decision previously made that has not issued any formal interpretation of the rules and regulations at issue. And this is the case that we have before us today. The Forest Service has not previously issued any guidance or interpretation of the standards and guidelines of the Northwest Forest Plan that we might be able to rely on and apply broadly to each case. In this circumstance, there has been no general expression of interpretation. Rather, the Forest Service has set forth this interpretation to defend a decision previously made and advance a litigation position. Counsel, I think it's generally fair to say that judges are very reluctant to go back into managing the way the forests are run. May I suggest that you need to tell us what is it that the Forest Service did that violated the plan? Certainly, Your Honor. The Northwest Forest Plan requires post-fire logging and late successional reserves. to meet certain standards and guidelines. Late successional reserves have been set aside by the Forest Service specifically to provide habitat for old growth-dependent species. In this case, the Forest Service has done the exact opposite. It has implemented a plan that will have devastated impacts to the habitat of the Metolius Late Successional Reserve. The analysis in the FEIS documents that the plan, in this case, will degrade up to 4,000 acres of habitat for old growth-dependent species in a late successional reserve, which has been set aside for exactly those species. Counsel, as I read what the Forest Service did, and correct me if I'm wrong, it seemed to me they were engaging in a balancing here, that they would identify some degradation, but they would also identify some benefit. Are you suggesting that that's not permitted with respect to the plan? Your Honor, the Forest Service, the way that we have read the briefs, is they've stated that the plan will have different impacts on different species. Some species that prefer open, more open stands of trees, according to the Forest Service, may benefit from this sale, whereas other species that prefer denser stands of trees and snags will not benefit. In fact, however, if you look at the analysis, and the Forest Service designated seven different species of cavity-nesting birds as indicators of forest health, and those different species prefer different types of habitat. Lewis's woodpecker, for instance, prefers open stands, and the black-backed woodpecker prefers unlogged, denser stands. In fact, this project will have a negative impact on habitat for each and every single one of those seven cavity-nesting species. So the Forest Service cannot carry a statement that this project will actually benefit any of the species that have been identified as indicators of forest health here. Each and every single one of those seven cavity-nesting species will experience significant reductions in habitat in the late successional reserve. This results from the fact that the Forest Service has targeted the largest snags, which are most valuable for wildlife, to be logged as part of this project. The Northwest Forest Plan recognizes the importance of snags in providing for wildlife habitat. There are more than 60 species in eastern Oregon that rely on snags, and the Forest Service has stated in the Northwest Forest Plan that commercial logging of snags can reduce the carrying capacity for these species for many years into the future. Let me see if I understand. You're saying that the Forest Service selected the wrong indicator species in light of the Northwest Forest Plan. Is that correct? No, Your Honor. We believe they selected the right suite of indicator species. These species that they selected, Lewis's woodpecker, the black-backed woodpecker, and other cavity-nesting birds are associated with old-growth forests, and those are the right species to be looking at. Our point is that the Forest Service analysis states in the FEIS that this project will degrade thousands of acres of habitat for each one of those species. And that's incorrect? That's correct. The Forest Service claims this project will benefit some species and will hurt other species. In fact, what the analysis shows is that this project will hurt every single species that has been looked at by the Forest Service. So they picked the right species, but their analysis was incorrect? They picked the right species. Their analysis is correct. Their representation of the analysis is incorrect. They have told us that, no, this project will benefit some species and will harm other species. But, in fact, if we look at the analysis, which is contained in the excerpt of record at page 353, for instance, the project will degrade more than 4,000 acres of habitat for the Lewis's woodpecker, 1,000 acres of habitat for the black-backed woodpecker, and that trend is the same for each and every single one of the seven cavity-nesting species the Forest Service looked at as indicators of forest health in this case. So when the Forest Service tells us that this project will benefit some species but will harm other species, in fact, that's an incorrect representation of the analysis as contained in the planning documents. This project will have a dramatic negative impact on every single one of the species that the Forest Service looked at as providing indicators of forest health for cavity-nesting species. And so this is why we say that the Forest Service has fundamentally violated the balance created by the Northwest Forest Plan. Let me just test that a little bit. You are doing more than simply disagreeing with their conclusion. What you're saying, if I understand you correctly, is that their own analysis does not support their conclusion. Is that what you're saying? That's correct, Your Honor. The Forest Service biologists considered the data that we've been discussing at page 353 of the excerpt of record, where it details and provides quantified predictions of habitat suitability. And the Forest Service biologists looked at that information and concluded that the plan will result in a decrease in structure, primarily material greater than 12 inches diameter at breast height. As a result of this, current species abundance may decrease or species may be displaced into adjacent or into marginal habitat. And this is in the excerpt of record at page 354, the very next page. So the biologists themselves looked at the analysis and concluded that this project will have a negative impact on species population and abundance because of a degradation of habitat in the planning area. And again, this holds true. And you're suggesting there's no offsetting gain identified in the process of the same analysis. That's right. If you look at the table which sets forth the predictions of habitat suitability, and again, this is in the excerpt of record at page 353, the table lists out the seven individual species of cavity nesting birds that are associated with old growth forests that the Forest Service looked at. And this project will not benefit a single species under that analysis. Not a single species. So there is balance created by the Northwest Forest Plan. Commercial logging is allowed in the wake of a fire, but only if it protects the suitability of wildlife habitat in the late successional reserve. Here, this plan targets the largest snags, and that construction of a plan has the result of degrading habitat for every single species looked at by the Forest Service. So this logging plan fundamentally violates the balance created by the Northwest Forest Plan. Doesn't the snag retention guideline require that the service focus only with respect to the snags? In other words, that they take them into account among other things. Do you agree with that? Or is it your view that somehow or other they have to protect the largest snags no matter what? Your Honor, we believe there are two distinct requirements in this case that we're talking about. One is protecting habitat suitability. Right. That's one part. The other part is snag. That's correct. And the second is the Forest Service should focus on retaining snags that are likely to persist at least 80 years. Okay. And you're suggesting that they did not do this with respect to the snags in this case? Correct. For the reason that? In order to focus on retaining snags that are likely to persist, the Forest Service first has to develop some criteria or attempt to identify which types of snags, based either on the size, diameter, breast height, extent of damage resulting from the fire, but must develop some criteria to help the public and the agency predict which types of snags will persist or are likely to persist for 80 years. In this case, the Forest Service has not developed any of that criteria. The agency, the public, has not had any information to help them identify which snags are likely to persist. Instead of identifying that criteria, the Forest Service relied on supposed snag retention recommendations from the Metolius Late Successional Reserve Assessment. Now, we question the validity of relying on the Late Successional Reserve Assessment. First, that document does not contain the snag retention figures that the Forest Service relies on in this case. The LSRA specifically states that numbers of snags will be determined at the project analysis level. This is in the excerpt of record at page 95, and the LSRA does not set forth any snag retention figures. Nevertheless, the recommendations that are included in the LSRA provide recommendations for managing green timber stands and not burned stands. So the LSRA discusses balancing fire risk versus wildlife habitat in green stands, but the LSRA never makes an effort to determine which snags in burned stands are likely to persist for at least 80 years. So in relying on the LSRA, the Forest Service implemented recommendations focused on the wrong management objective in this case. Now, in this balancing that Tejo Scanlon was referring to, as I read the excerpt of record, page 46, the scales are tipped decidedly in favor of habitat retention unless there is good reason to act otherwise. Am I reading that correctly? That's the excerpt of record, page 46? Yes. The focus on retaining snags that are likely to persist until late successional conditions have developed seems to mean that the scales are tipped decidedly in favor of habitat retention unless there is good reason to act otherwise, and that is what you're claiming was not done here. That's correct, Your Honor. We would say that it's incredibly important to retain the snags that are likely to persist for 80 years because we need to bridge the time gap until a new forest can regrow and again provide that type of habitat. The Forest Service will probably say when they come up that by looking at the fire risk, they are in effect preserving them for 80 years because you wouldn't harvest a seedling for about 80 years. Your Honor, we had asked the Forest Service to look at a different alternative to get at this issue of fire risk. Plaintiff's appellants had asked them to look at a different alternative. The Forest Service has claimed that it's removing the largest snags to address fire risk, but what it is doing is leaving heavy fuel loading of small diameter material, which is more fire prone, across the landscape. So, CWP and the other plaintiffs had requested a different alternative that would have focused on smaller diameter material to identify how this project would impact fire risk as compared to a restoration approach to the landscape. But that alternative did not consider economic considerations, did it? Well, Your Honor, we believe that there are strong economic reasons to consider restoration. We think it's incorrect to say that restoration has no benefit to the local economy. We believe that small diameter materials can provide economic return and that restoration can provide economic benefits for the local community. But were they spelled out in the presentation of the alternative plan? We had, plaintiffs had asked the Forest Service to consider that information. In providing alternatives, the plaintiffs don't have the burden of doing the analysis and identifying what those economic benefits are. You mentioned economic benefits. Yeah, I believe we, I'd have to go back and review it again. I guess when I reviewed the plans, I didn't see any mention in the alternative plan that was suggested, but I could well have missed it. There's a lot of paper in this. Well, we set forth an alternative that was focused primarily on forest health. The Forest Service responded by saying it wouldn't meet an economic need. In reality, there are good, sound economic reasons to consider restoration as opposed to targeting the largest snags on the landscape. I have about a minute left. I'd like to save that for Final Circuit. You may be served. Thank you, Counsel. We'll hear from the government. May it please the Court, Anna Katselis for the United States Forest Service. The District Court correctly rejected the plaintiff's challenges to the Ireley Project in this case. I would like to begin by starting with the language of the Northwest Forest Plan. The plaintiffs have focused on two provisions. Number one, salvage operations should not diminish habitat suitability now or in the future, and two, management should focus on retaining snags that are likely to persist until late successional conditions have developed and the new stand is again producing large snags. These guidelines must be read in context, Your Honors. The NFP undoubtedly does strike a balance, and it expressly provides for salvage operations. Specifically, it explains that the guidelines are intended to prevent negative effects on late successional habitat while permitting some commercial wood volume removal. Excuse me, Counsel. The problem I have is you say they struck a balance, but it appeared to me that they didn't consider the overall foresty plan when they were trying to strike the balance with respect to this one area. They didn't consider the entire forest plan? They did not consider the priorities of the overall forest plan, the National Forest Plan. Your Honor, I would disagree that the record supports that interpretation. The Forest Service did focus on the correct objectives of retaining snags in this case and protecting habitat. The plaintiffs differed in the overall area, Your Honor, correct. Well, then how do you specifically disagree with what we've heard from Mr. Winter, who obviously has a different view on that very specific point? Well, Your Honor, I think the record reflects that the Forest Service conducted a very careful analysis of the impacts that this project would have and, in fact, retained the largest snags. For instance, the record indicates that 85% of the Mixed Conifer Wet Plan Association group of the snags retained are over 15 inches diameter at breast height. The Forest Service retained a very large amount of snags. We feel it's important to point out that this is a very conservative salvage operation. It provides for salvage of only a quarter of the burned timber. Twelve thousand of the acres, no large diameter trees will be altered with the exception of those that are hazard trees along roads. This was a large catastrophic fire, and the conditions that are there now, the record indicates, are not sustainable conditions. The Forest Service in this case is focusing on moving the conditions back to sustainable conditions by retaining snags, also by replanting in the harvested areas. It is a fact in this case that many, about 75% of the snags created by the fire, are expected to fall within a short period of time. By replanting and re-harvesting, reforesting, excuse me, the area, alternative two will actually create a larger number of snags over the long term. The plaintiffs are very focused on the short term. I think a fundamental difference here is in the focus here, and the Forest Service is properly focused on moving the resource condition back to its desired condition over the long term. And so the Forest Service has taken that into account. Alternative two would actually replant more than alternative one, and therefore result in more snags over the long term as trees grow and then naturally die and become snags as opposed to large catastrophic fires in this instance. With respect to impacts on, and also snags, just as an example, the project would be between 15 and 25 snags per acre greater than 9 diameter at breast height, and an average of 6 snags per acre greater than 16 inches diameter at breast height. The NFP plainly does not require that the Forest Service retain any set level of snags greater than a certain size. It says should, and it doesn't provide any numeric requirement or any prohibition of any kind. And the record in this case, Your Honors, does indicate that the Forest Service is properly focused on retaining a large number of snags of a large size. Also, Your Honors, the EIS goes forth in detail to explain how the Forest Service complies with the snag guideline. It authorizes salvage only where canopy closure is less than 40 percent, doesn't authorize salvage in disturbed sites that are less than 10 acres, and limits salvage to dead trees, leaving the fire-injured trees to die and create new snags. It conservatively retains snags project-wide at the levels required by the Metolius Lake Successional Reserve Assessment. I want to ask a question about the habitat side of this. You heard Mr. Winters' criticism that the Forest Service identified degradation in specific categories of species. His point is that their conclusion of balancing cannot be sustained in light of their actual findings in the analysis. What's your response? We disagree with that assertion, Your Honor. The EIS does disclose that there will be some impacts to woodpecker habitat. These impacts are actually... They also show that there would be adequate habitat under Alternative 2 as well. And just to step back for a minute and describe the analysis, it does show that... The analysis shows that certain species of woodpeckers prefer certain areas with snag densities of a certain size. And the analysis does disclose that there will be impacts to that habitat. But compared to the no-action alternative, Your Honor, these impacts are not substantial. For instance, with the black-backed Lewis's woodpecker, there's an additional 351 acres of habitat greater than the 50% tolerance level. And we're talking about a decent-sized project that's not very substantial. So you would regard that as an offset against the degradation? Is that what you're suggesting? An offset? Well, I'm just... For the current point, I'm trying to point out that the plaintiff's characterization that these impacts are enormous or extremely large is not correct. Oh. It points out that the impacts are not as substantial. Lewis's woodpecker, which is the other end of the spectrum, there would be about 1,249 additional acres greater than 50% tolerance level under the no-action alternative. Now, again, Your Honors, we feel it's very important to point out that this is a short term. This is an analysis of sort of right now the present condition, which is not a sustainable condition. The condition is there is heavy fuel loading, and the real goal has to look further afield and further in the future. And when these snags begin to fall, which they are predicted to do in the short term, this difference is going to balance out. I mean, it's going to... The long term difference is not represented by the figures that the plaintiffs are focusing on, and that is the difference that needs to be the focus of the court's analysis and the focus of the Forest Service's analysis, which it properly was in this case. Let me see if I understand. The National Forest Plan tips the scales decidedly in favor of habitat retention unless there is a good reason not to do so. Your good reason is that it's better to take them now, plant the trees, wait 80 years, that there will be then large snags ultimately if we get rid of the large snags now and plant. I mean, is that... In the short term, they'll be lost, but in the long term, they'll be more likely to plant trees, have them grow, and then large snags will form when there's another fire, et cetera. I mean, I'm trying to understand why you think there is a good reason not to protect these large snags now. You've indicated in the short term they're going to fall off anyway. Well, first, Your Honor, I would begin by saying that the Forest Service has protected the large snags now. The Forest Service has retained a significant number of large snags. This, the Eyerle Fire was an 18,000-acre fire. 12,000 acres, no large snags are going to be altered with the exception of those that are hazard trees along roads. There is an abundance of snag habitat created by the Eyerle Fire. This is a conservative project. It salvages a quarter of the timber, but it does focus on retaining the largest snags, and it retains a significant number. It does not retain all of the largest snags. That essentially seems to be the plaintiff's position, that the Northwest Forest Plan requires the retention of all snags above a certain diameter size. The Northwest Forest Plan does not require that. It does not provide for that. It provides for the Forest to focus on retaining snags that are likely to persist. These are the larger snags, and the Forest Service has done that. Again, 85% of the snags that are retained are a large size in diameter or breast height. Six snags per acre, on average, are greater than 21 inches. The Forest Service has focused, has applied this correct objective. Also, Your Honor, the second part of the answer to your question is that the Forest Service is also under the Northwest Forest Plan to consider the future condition of the forest, and one reason the Northwest Forest Plan points out that can be a reason for harvest is for future fuel conditions, and that is a reason here in this case, and it's set forth in the record in some detail, that there's heavy fuel loading now as a result of the fire, and this fuel loading will increase over time. So there is an interest in reducing these fuel loadings on the forest floor. So here, I think, Your Honor, the record reflects that the Forest Service has achieved the balance that is intended by the Northwest Forest Plan. The Northwest Forest Plan, you are correct, Your Honor, does provide for the Forest Service to focus on habitat and to focus on retaining snags, and the Forest Service has done that. But the Northwest Forest Plan also strikes a balance and provides for the removal of some timber, and that is exactly what the Forest Service has done in this case. Its analysis of the impacts is thorough and careful and looks at the most recent research, and it discloses those impacts and explains that while there is some impact now, there's an impact, you know, about 1,200 acres difference for the Lewis's woodpecker, 300 acres for the Blackback woodpecker. That's now, but these snags are going to fall over time, and the difference between the no-action alternative and the action alternative over the long term is even less than that. Let me ask you the question. Assuming the Forest Service has done this, but there is other evidence that it's inadequate, to what degree of deference do we owe the Forest Service plan? Well, first, with respect to the interpretation of the Northwest Forest Plan, Your Honor, we say first that the language is clear, that it does not require what the plaintiffs say it does. It does not require what? What the plaintiffs claim, which is essentially that the Forest Service is required to retain all large snags above a certain number that the plaintiffs have selected, the diameter of breast height. But the Forest Service, and I'll cite, we cited Forest Guardians in our brief, is entitled to deference in its interpretation of a forest plan unless that interpretation is clearly erroneous or inconsistent with the Forest Plan, and the Forest Service interpretation here is not so. And it is not the case that they are not entitled to deference or this deference is lessened to any degree because this interpretation is not set forth in some other document. The Forest Service is entitled to deference here should this Court determine that the requirements of the Northwest Forest Plan are ambiguous. Again, Your Honors. Well, what about Mr. Winter's suggestion that the guidelines seem, at least in his view, to have a stronger dignity or a greater dignity, more akin to a statutory command? I'm sorry? What about Mr. Winter's argument that the Forest Service is not following its own guidelines in effect? I think that's what the bottom line is. Correct. What about Mr. Winter's suggestion that the guidelines are not as flexible as the Forest Service would have us believe? Well, I think resort to the language of the guidelines is this Court's answer to that question. First, they mischaracterize our position as saying that these guidelines are not binding on the Forest Service. They are. We're not taking the position they are not enforceable. But our position is they do not say, which the plaintiffs have asserted, that the Forest Service must retain all snags or must, I mean, their position essentially is the Forest Service must retain all snags above a size and must not take any action that would have any impact on habitat. That cannot be the meaning of the Northwest Forest Plan. If that were the case, it would not provide for some commercial wood volume removal. It would not explain that salvage can have benefits in terms of wildlife and also in restoring the forest to ideal conditions. The Northwest Forest Plan just does not support that interpretation. The Forest Service was not given the authority by Congress, was it, to make legally binding rules. If it had been delegated that authority to make legally binding rules, I would think great deference would be owed. And it's not that deference is not owed, but it's a different kind of deference than if they had the authority to make these legally binding rules, especially in light of the overall priorities set out by Congress to preserve the environment. So when I ask the question about what kind of deference, certainly we respect the agency and all the wonderful work that it does. But whether we give it, as we call it, Chevron deference would be an analogy. I think that's not true here because it hasn't been given the authority to make legally binding rules. In fact, there's some authority, a Supreme Court authority, that these kinds of rulings, while not controlling upon the courts by reason of their authority, constitute a body of experience and informed judgment to which the courts may look for guidance. But it's a different kind of deference than they've made the rule, and we have to find a good reason to go against their finding. I'm trying to raise this issue and see what your response is. Well, Your Honor, I would respectfully disagree with that because, again, I would return the court to Forest Guardians where they said that the interpretation of a forest plan is the deference entitled to that is a deference entitled to an agency's interpretation of its own regulations, which generally is even higher than Chevron deference. But in this case, Your Honor, I think also this case doesn't come down to a determination of what kind of deference is owed because I think the Northwest Forest Plan, by its plain language, requires something that is consistent with what the Forest Service has done in this case. The Forest Service has focused on retaining snags and focused on ensuring adequate habitat here. This is consistent with the general guidelines that the Northwest Forest Plan sets forth. And the Forest Plan itself says that these guidelines are general. They do not establish numeric requirements or absolute prohibitions of any kind. They require the service. But they do tip the balance in favor of preserving habitat. Would you agree with that? I would agree with that, Your Honor, they do. And I think the Forest Service has fulfilled that here by doing the analysis that it has done, looking carefully at the impacts on species and evaluating those impacts and determining that the balance struck is correct here. What's the counter to what Mr. English calls devastating impact on habitat? You heard him say that here. I did. And we would vigorously disagree, Your Honor. They have focused on the species of primary cavity excavators or woodpeckers. These are not sensitive species. There's no indication that they are at risk in any way. They're certainly not threatened or endangered. And, for instance, the Lewis's woodpecker, which they have referred to, requires a home range of 15 acres. That's in the record. And the analysis by the Forest Service shows that there is ample habitat for the Lewis's woodpecker and for the other species that the plaintiffs have focused on. Again, this created their focusing on post-fire habitat. The Ireland Fire created an abundance of this, and the great majority of it, the Forest Service is not addressing, is not touching in the Ireland Fire salvage project. Salvage is occurring in a very conservative portion of this project. Thank you, Counsel. Your time has expired. We will hear from Mr. Winter. You have about a minute and a second. Thank you very much, Your Honor. We have heard three or four times from the Forest Service that our argument is that the Forest Service must retain all large snags. CWP and plaintiffs' appellants have never made that argument. That is a significant mischaracterization of our position. Our position is that the Forest Service fundamentally violated the balance of the Northwest Forest Plan by targeting the largest snags for commercial wood removal. To give you a sense of the Forest Service's plan. Well, isn't that the same thing? Aren't you really saying the same thing in different words? No, Your Honor, I don't think we are. I think if the Forest Service had focused on medium to small diameter material, they could have removed some larger trees as well and still preserved habitat quality. In this case, however, the Forest Service has targeted only trees greater than 12 inches diameter breast height across a vast majority, more than 3,900 acres of the project planning area. So the Forest Service, and this is in the excerpt of record at page 359, targeted only trees greater than 12 inches diameter breast height for removal. They have specifically targeted the largest trees. And so we believe that commercial wood removal is absolutely consistent with habitat protection if the Forest Service simply refocuses on smaller and mid-sized diameter material and could still take out a few of the largest trees. Thank you, Counsel. Your time has expired. The case just argued will be submitted for decision, and the Court will adjourn.
judges: Browning, D.W. Nelson, O'Scannlain